Aspen Specialty Ins. Co. v. Nucor Corp., 2025 NCBC 67.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ASPEN SPECIALTY INSURANCE
COMPANY; ENDURANCE AMERICAN
SPECIALTY INSURANCE COMPANY;
PARTNERRE IRELAND INSURANCE
LTD.; HELVETIA SWISS INSURANCE
COMPANY; LEXINGTON INSURANCE
COMPANY; LIBERTY MUTUAL FIRE
INSURANCE COMPANY; LIBERTY
SURPLUS LINES INSURANCE
COMPANY; XL INSURANCE AMERICA,
INC.; ZURICH AMERICAN INSURANCE
COMPANY; and ACE AMERICAN
INSURANCE COMPANY,

        Plaintiffs,

 v.

NUCOR CORPORATION and NUCOR
STEEL LOUISIANA, LLC,

        Defendants,

and

XL INSURANCE AMERICA, INC.; and
LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

        Intervening Complaint-
        Plaintiffs,

v.

NUCOR CORPORATION and NUCOR
STEEL LOUISIANA, LLC,

        Intervening Complaint-
        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19CVS019887-590

**ORDER AND OPINION ON CROSS-
MOTIONS FOR SUMMARY
JUDGMENT AND PLAINTIFFS'
MOTION TO STRIKE LEVANDUSKI
DECLARATION**

**[PUBLIC]**

1.    **THIS MATTER** arises from an industrial accident at a Nucor Corporation and Nucor Steel Louisiana, LLC (collectively, Nucor) steel manufacturing facility and Nucor's subsequent claims for coverage under its property and equipment breakdown insurance policies.  Plaintiffs (the Property Insurers) and Intervening Complaint-Plaintiffs (the EB Insurers) contend that the loss is not covered under either of their policies.[1]

2.    The case is before the Court on four cross-motions for summary judgment and a motion to strike, specifically: (i) Intervening Complaint-Plaintiffs XL Insurance America, Inc. and Liberty Mutual Fire Insurance Company's Motion for Summary Judgment (the EB Insurers' Motion), (ECF No. 267 [EB Ins. Mot.]); (ii) Plaintiffs' Motion for Summary Judgment as to Counts I and V of their Complaint and all Counts in Nucor's Counterclaim (the Property Insurers' Motion), (ECF No. 270 [Prop. Ins. Mot.]); (iii) Nucor Corporation and Nucor Steel Louisiana, LLC's Motion for Partial Summary Judgment Against Intervening-Complaint Plaintiffs (Nucor's EB Insurance Motion), (ECF No. 275 [Nucor Mot. EB Ins.]); (iv) Nucor Corporation and Nucor Steel Louisiana, LLC's Motion for Partial Summary Judgment Against Plaintiffs (Nucor's Property Insurance Motion), (ECF No. 278 [Nucor Mot. Prop. Ins.]), (collectively, the Cross-Motions for Summary Judgment); and (v) Plaintiffs'

---

[1] Because certain materials referenced in this Order and Opinion were filed under seal, (*see* ECF No. 324), the Court's ruling was provisionally filed under seal on 27 October 2025.  The Court then permitted counsel for the parties to confer and advise the Court whether they contend any matters referenced herein should be sealed.  Having afforded the parties this opportunity, the Court now files its Order and Opinion on the public record.

Motion to Strike Levanduski Declaration (the Motion to Strike), (ECF No. 308 [Pls.' Mot. Strike]), (collectively, the Motions).

3. After considering the Motions, briefs, exhibits filed with respect to the Motions, oral arguments of counsel, and other relevant matters of record, the Court **GRANTS in part** and **DENIES in part** the parties' Cross-Motions for Summary Judgment and **DENIES** the Motion to Strike.

> *Hedrick Gardner Kincheloe & Garofalo, LLP by David Levy and C. Rob Wilson, III; and Hinshaw & Culbertson LLP by David E. Heiss and Peter E. Kanaris for Plaintiffs Aspen Specialty Insurance Company; Endurance American Specialty Insurance Company; PartnerRe Ireland Insurance Ltd.; Helvetia Swiss Insurance Company; Lexington Insurance Company; Liberty Mutual Fire Insurance Company; Liberty Surplus Lines Insurance Company; XL Insurance America, Inc.; Zurich American Insurance Company; and Ace American Insurance Company.*
>
> *DLA Piper LLP (US) by Robert Santoro, Aidan Middlemiss McCormack, and Benjamin D. Schuman; and Johnston, Allison & Hord, P.A. by Kimberly J. Kirk and Katie D. Burchette for Intervening Complaint-Plaintiffs XL Insurance America, Inc. and Liberty Mutual Fire Insurance Company.[2]*
>
> *Flanagan Partners, LLP by Camille E. Gauthier, Harold Jude Flanagan, Thomas Moore Flanagan, Meghan Grant,[3] and Alixe L. Duplechain; and Moore & Van Allen PLLC by Scott M. Tyler and Jonathan Daugherty Gilmartin for Defendants and Intervening Complaint-Defendants Nucor Corporation and Nucor Steel Louisiana, LLC.*

Earp, Judge.

---

[2] On 10 June 2025, Robert Santoro and Aidan McCormack informed the Court of their change in law firm affiliation from DLA Piper LLP (US) to Dentons LLP US, (ECF No. 333), and Benjamin D. Schuman moved to withdraw as counsel, (ECF No. 334). The Court granted Mr. Schuman's motion on 16 June 2025. (ECF No. 336.)

[3] The Court granted Ms. Grant's motion to withdraw as counsel on 6 February 2024. (ECF No. 258.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

4. The Court does not make findings of fact when ruling on motions for summary judgment, but instead "summarizes the relevant evidence of record, noting both the facts that are disputed and those that are uncontested, to provide context for the claims and the [m]otions." *Aym Techs., LLC v. Rodgers*, 2019 NCBC LEXIS 64, at *2 (N.C. Super. Ct. Oct. 16, 2019) (citing *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975)).

5. Plaintiffs are ten property insurers[4] that contracted with Nucor Corporation to provide first-party commercial property insurance that was in effect from 1 January 2017 to 1 January 2018. (*See* Compl. Exs. A–K [Prop. Policies], ECF No. 3.) The Property Insurers provided coverage pursuant to a manuscript policy custom-designed for Nucor by its broker, Marsh USA, Inc. (*See* Prop. Ins. Mot. Ex. S 33:7–34:10 [Marsh Dep.], ECF No. 276.)

6. Intervening Complaint-Plaintiffs are two equipment breakdown insurers, XL Insurance America, Inc. (XL) and Liberty Mutual Fire Insurance Company (Liberty Mutual), that contracted with Nucor Corporation to provide equipment breakdown insurance (the EB Policy) from 15 September 2016 to 1 January 2019. (*See* Intervening Compl. Ex. A, ECF No. 6; XL Mem. Law Opp'n Nucor Mot. Partial Summ. J. Ex. A [EB Policy], ECF No. 172.1.)

---

[4] Aspen Specialty Insurance Company, Endurance American Specialty Insurance Company, PartnerRe Ireland Insurance Ltd., Helvetia Swiss Insurance Company, Lexington Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Surplus Lines Insurance Company, XL Insurance America, Inc., Zurich American Insurance Company, and Ace American Insurance Company.

7.     Defendant Nucor Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  (Nucor Countercls. [Prop. Ins.] ¶ 1, ECF No. 25 [Nucor Countercls. Prop. Ins.].)

8.     Defendant Nucor Steel Louisiana, LLC (NSLA) is a subsidiary of Nucor Corporation.  Its principal place of business is in Convent, Louisiana.  (Nucor Countercls. Prop. Ins. ¶ 2.)  Both Nucor Corporation and NSLA are insureds under the policies at issue.  (Prop. Policies; EB Policy.)[5]

9.     Nucor's Convent facility processes iron ore that is then shipped to another facility for use in the production of steel.  (Prop. Ins. Mot. Ex. E 28:9–29:13 [Lynch Dep.], ECF No. 276.)  During the production process, raw iron ore pellets are transported on conveyor belts, coated with cement, and then fed into a reactor, where they are heated to produce direct reduced iron (DRI).  (Lynch Dep. 28:9–29:13; Prop. Ins. Mot. Ex. A 34:6–12, 72:10–11 [Price Dep.], ECF No. 276.)  Iron ore that enters the reactor without the protective cement coating solidifies and cannot be used in steel manufacturing.  (Lynch Dep. 29:25–30:3, 137:24–138:13.)

10.    Nucor's production process is managed by a computerized distributed control system (DCS).  The DCS consists of computers, servers, and software, as well as field devices (such as encoders) and communication cabling and hardware.  The DCS is monitored by Nucor personnel in a control station.  (Price Dep. 17:23–18:16.)

---

[5] The Property Policies define the "Insured" as "Nucor Corporation and its affiliated, parent and subsidiary companies[.]"  (Prop. Policies 1.)  The EB Policy defines the "Insured" as "Nucor Corporation and any subsidiary, associated or affiliated companies, corporations, forms or organizations in which the Insured has management control or ownership and is responsible to insure[.]"  (EB Policy, at EB_XL_0000044.)

11. To ensure the iron ore is properly coated with cement, each conveyor is equipped with a weigh belt feeder system that includes an encoder to measure the speed of the conveyor belt, and a weigh bridge to measure the weight of the pellets before they enter the reactor. (Price Dep. 23:13–16, 38:21–39:13, 45:18–20, 234:21–24; Prop. Ins. Mot. Ex. O 87:13–88:2, 111:5–9 [ThermoFisher Dep.], ECF No. 276.) The weigh belt feeder system is controlled by the DCS. (Price Dep. 18:8–16, 22:18–23:12.)

12. On or about 7 November 2017, Nucor personnel identified a weight discrepancy involving the weigh belt feeder system on conveyor line R6-C04. (Price Dep. 72:10–11; Prop. Ins. Ex. C 21:5–13 [Rambin Dep.], ECF No. 276.) After unsuccessful attempts to troubleshoot the issue, Nucor contacted the manufacturer of the equipment. (Rambin Dep. 22:10–24:10; Lynch Dep. 36:6–9.) The manufacturer recommended that Nucor replace the conveyor belt's encoder (Subject Encoder). (Price Dep. 72:21–23; Rambin Dep. 23:8–24:10, 26:19–25.)

13. The evidence is mixed on whether Nucor technicians first consulted with Leon Cantu, Nucor's Control Systems Engineer, before deciding to replace the Subject Encoder, which was downstream from the cement coating system, with an encoder from a conveyor belt that was upstream from the cement coating system and not in operation at the time (Replacement Encoder). (EB Ins. Mot. Ex. E [Incident Investigation Notes], ECF No. 268.5; Price Dep. 39:14–20, 44:18–20; Rambin Dep. 26:19–28:25, 61:23–63:19; EB Ins. Mot. Ex. H 28:9–30:24 [Bearden Dep.], ECF No. 268.8; EB Ins. Mot. Ex. Q [Cantu Email to Management], ECF No. 268.17.) With

the Replacement Encoder in place, Nucor personnel were able to bring the R6-C04 weigh belt feeder system back online. (Prop. Ins. Mot. Ex. B [Riggs Dep.] 29:14–22, ECF No. 276; Lynch Dep. 100:9–13.)

14. More than seven hours (and a shift change) went by before Nucor personnel realized that, consistent with the DCS's software program, unwiring and removing the Replacement Encoder for use on the R6-C04 weigh belt feeder system caused the DCS to receive a "bad status" signal. That signal caused the cement-to-ore ratio controller, which determines cement output, to switch from automatic to manual mode. (Price Dep. 30:2–7, 38:17–41:8, 80:14–15, 96:16–98:12.)

15. The same day, the cement coating system was intentionally shut down to swap out a surge bin used for collecting excess iron ore, a regular occurrence. (Price Dep. 47:25–48:3.) In accordance with its programming, the shutdown caused the cement-to-ore ratio to reset to zero kilograms per ton and the ratio controller's output to be zero kilograms per hour. (Price Dep. 50:17–24, 61:1–16, 166:4–11.)

16. When the cement coating system was restarted, instead of the ratio controller returning to the proper setting, the bad status signal that resulted from removing the Replacement Encoder caused the ratio controller to remain in manual mode. As a result, the system retained the last-known cement output, which was zero kilograms per hour. Consequently, iron ore pellets entering the reactor were not coated with cement before they were subjected to heat. (EB Ins. Mot. Ex. A 3–4 [Nucor Root Cause PowerPoint], ECF 172.2; Price Dep. 29:11–30:7, 33:7–24, 35:16–23, 45–61, 163:9–165:11.) Approximately two thousand four hundred (2,400) metric

tons of uncoated iron ore pellets melted and clustered inside the reactor before Nucor personnel identified the problem. (Nucor Root Cause PowerPoint 3.)

17.     The incident required Nucor to shut down its reactor. Once it was safe to do so, Nucor cut the reactor open, removed the clustered ore, and repaired the reactor. (Lynch Dep. 138:10–141:7.) It contends that this process amounted to more than a mere cleaning, and that the reactor was damaged in the process. (Nucor Countercls. Prop. Ins. ¶ 29; Br. Opp'n Prop. Ins. Mot. 26, ECF No. 306 [Nucor Br. Opp'n Prop. Ins. Mot].) All told, Nucor claims losses in excess of $14 million resulting from the incident. (Nucor Am. Countercls. Intervening. Compl.-Pls. ¶ 7, ECF No. 209.)

18.     After discovering the problem, Nucor employees checked the operating manual for the coating system, accessed the DCS software, and reset the bad status signal. (Price Dep. 109:7–11; EB Ins. Mot. Ex. N [Price Email to King et al.], ECF No. 268.14.) Mr. Cantu sent an email to the technicians telling them that the root cause of the incident was the removal of the Replacement Encoder and instructing them that, "if a piece of equipment will be changed, please make sure to double check the effects on the process (including logics and control strategies), before doing so. . . . If you have a doubt about how an equipment change could interfere with a control/logic strategy[,] feel free to ask." (EB Ins. Mot. Ex. P [Cantu Email to NSLA Maintenance et al.], ECF No. 268.16.)

19.     Mr. Cantu also wrote to Nucor's management to "suggest a new procedure when removing instrumentation, because even if we add the most sophisticated

logic[,] it will fail if we keep removing instruments without knowing the effect on the plant." (Cantu Email to Management.)

20. Subsequently, Nucor added interlocks to the DCS software to stop the weigh belt feeder and cement coating systems in the event the DCS detected a bad status signal. (Price Dep. 130:8–133:22, 222:18–224:17). Nucor also disciplined and demoted the DCS operator on duty when the incident occurred. (Riggs Dep. 62–65.)

21. Nucor timely reported the losses to its carriers. (*See* EB Ins. Mot. Ex. S [Notice of Claim Email Chain], ECF No. 268.19.) Both the Property Insurers and the EB Insurers denied the claim. (Compl. Ex. M [Prop. Ins. Denial Letter]; Nucor Mot. Partial Summ. J. XL Ex. A, Ex. 23 [EB Ins. Denial Letter], ECF No. 164.)

22. On 4 November 2019, the Property Insurers filed this action seeking a judgment confirming that their respective policies do not cover (and/or exclude) the losses sustained by Nucor. (Compl., ECF No. 3.) The EB Insurers followed suit on 11 March 2020 by filing their Intervening Complaint, also seeking a declaratory judgment with respect to coverage. (Intervening Compl., ECF No. 6.) Nucor, in turn, counterclaimed against both sets of insurers for breach of contract and declaratory relief. (Nucor Countercls. Prop. Ins.; Countercls. Nucor [EB Ins.], ECF No. 26 [Nucor Countercls. EB Ins.].)

23. On 11 July 2022, Nucor moved to amend its counterclaims against the EB Insurers to, among other things, add a claim for alleged violations of the unfair claim settlement practices section of the North Carolina Insurance Code, N.C.G.S. § 58-63-15(11). (Nucor Mot. Leave Amend Countercls. Intervening Compl.-Pls., ECF

No. 181.) The Court granted the motion in substantial part on 8 November 2022, *Aspen Specialty Ins. Co. v. Nucor Corp.*, 2022 NCBC LEXIS 134, at *34 (N.C. Super. Ct. Nov. 8, 2022), and Nucor added its claim, (Nucor Am. Countercls. Intervening. Compl.-Pls. ¶¶ 64–68).

24. Following the close of discovery, the parties filed the cross-motions for summary judgment and the motion to strike now at issue. After full briefing and a hearing on the Motions, they are ripe for disposition.

## II. LEGAL STANDARD

25. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c).

26. Genuine issues of material fact are those "which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation modified).

27. In reviewing a motion for summary judgment, the Court does not resolve issues of fact and must deny the motion if there is any genuine issue of material fact. *Singleton v. Stewart*, 280 N.C. 460, 464 (1972). The Court must consider all evidence

in the light most favorable to the non-moving party. *Belmont Ass'n, Inc. v. Farwig*, 381 N.C. 306, 310 (2022).

28.     Parties moving for summary judgment have the burden of establishing the lack of any triable issue of fact. *Pembee Mfg. Corp. v. Cape Fear Constr. Co., Inc.*, 313 N.C. 488, 491 (1985). A movant may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). Should the movant satisfy its burden, "then the burden shifts to the non-moving party to 'set forth *specific facts* showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)).

29.     A party requesting affirmative summary judgment on its own claims must meet a greater burden. *Brooks v. Mount Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980). The moving party "must show that there are no genuine issues of fact, that there are no gaps in [its] proof, that no inferences inconsistent with [its] recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985). Thus, it is "rarely . . . proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

30.     "A dispute regarding coverage under an insurance policy is properly resolved on summary judgment where the material facts and the relevant language

of the policy are not in dispute and the sole point of contention is whether events as alleged in the pleadings and papers before the court are covered by the policies." *N. State Deli, LLC v. Cincinnati Ins. Co.*, 386 N.C. 733, 740 (2024) (citation modified).

31. In this case, except for whether the Subject Encoder functioned correctly, the parties largely agree on the sequence of events that led to the solidification of the iron ore. However, they each blame a different aspect of that sequence as the cause of the loss. Nucor contends that its loss stems from the failure of the Subject Encoder and an electronic circuitry impairment within the DCS that occurred after Nucor removed the Replacement Encoder from its initial position. (Nucor Br. Opp'n Prop. Ins. Mot. 21.) The Property Insurers contend that the loss was due to the defective design of the DCS, which did not stop the line when the bad status signal alarmed and allowed uncoated ore to enter the reactor. (Prop. Ins. Reply Br. Supp. Mot. Summ. J. 4, ECF No. 314 [Prop. Ins. Reply].) The EB Insurers contend that the loss was caused either by Nucor personnel's lack of familiarity with the programmed responses of the DCS or the DCS's faulty software design. (EB Ins. Reply Br. Supp. Mot. Summ. J. 2–3, ECF No. 315 [EB Ins. Reply].)

## III. ANALYSIS

### I. The EB Insurers' Motion for Summary Judgment

#### A. Breach of Contract

32. The EB Insurers request that the Court grant summary judgment (1) in their favor on their claims for declaratory judgment and (2) against Nucor on its claims for declaratory judgment, breach of contract, and unfair and deceptive trade

practices. (EB Ins. Br. Supp. Mot. 31, ECF No. 269 [EB Ins. Br. Supp.].) Specifically, the EB Insurers seek a judgment declaring that any losses Nucor suffered as a result of the incident described above are not covered under the EB Policy because no equipment "Breakdown," as that term is defined in the policy, occurred. (EB Ins. Br. Supp. 1.)[6]

33. The EB Policy "covers direct damage to 'Covered Property' resulting from a 'Breakdown' to 'Covered Equipment[.]'" (EB Policy, at EB_XL_0000044.) In addition, Endorsement #19 provides in relevant part:

> This Policy is extended to include loss or damage to "Covered Property" caused by the "Solidification" of materials resulting from a "Breakdown" to "Covered Equipment". Such loss or damage includes the following:
>
> 1. the cost for the removal of the solidified materials from the "Covered Property"; and
>
> 2. the cost of the materials that are solidified including the expense for their disposal; and
>
> 3. the cost to repair or replace damaged refractory
>
> If "Time Element Coverage" applies, the "Period of Restoration" is extended to include the additional period of time that is required for the removal of the solidified materials and repair or replacement of the damaged refractory.

(EB Policy, at EB_XL_0000109.)

---

[6] If the Court grants the EB Insurers' Motion, then Nucor's counterclaims for declaratory judgment, breach of contract, and UDTPA violations necessarily fail. *See Stott v. Nationwide Mut. Ins. Co.*, 183 N.C. App. 46, 50 (2007) ("For a breach of contract claim . . . [t]he insured party has the burden of bringing itself within the insuring language of the policy." (quoting *Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 605 (2006))); *Pinney v. State Farm Mut. Ins. Co.*, 146 N.C. App. 248, 256–57 (2001) (plaintiff not entitled to insurance coverage could not establish damages element of UDTPA claim).

34.     "Breakdown" is defined in the EB Policy as "direct physical loss that causes damage to . . . 'Covered Equipment' and necessitates its repair or replacement." (EB Policy, at EB_XL_0000053, EB_XL_0000077, EB_XL_0000093.) The EB Policy specifies, "Without 'Breakdown', there is no Equipment Breakdown coverage." (EB Policy, at EB_XL_0000044.)

35.     Endorsement #8 further defines "Breakdown" as follows:

**Covered Cause of Loss – Breakdown**
The Covered Cause of Loss for this Equipment Breakdown Coverage is "Breakdown".

"Breakdown" means the following direct physical loss or impairment that causes damage to or results in the shutdown of "Covered Equipment" and necessitates its repair or replacement:

1.  Failure of pressure or vacuum equipment;
2.  Mechanical failure including rupture or bursting caused by centrifugal force;
3.  Electrical failure including arcing; or
4.  "Electronic circuitry impairment[.]". . .

**Electronic Circuitry**
Means microelectronic components, including, but not limited to, circuit boards, integrated circuits, computer chips and disk drives.

**Electronic Circuitry Impairment**
Means a fortuitous event involving "electronic circuitry" within "covered equipment" that causes the "covered equipment" to suddenly lose its ability to function as it had been functioning immediately before such event.

 . . . .

3.  None of the following is an "electronic circuitry impairment":

        a.  Any condition that can be reasonably remedied by:

> (1) Normal maintenance, including, but not limited to, replacing expendable parts, recharging batteries or cleaning;
>
> (2) Rebooting, reloading or updating software or firmware; or
>
> (3) Providing necessary power or supply.

(EB Policy, at EB_XL_0000093–94.)

36. Endorsement #13 provides:

> **Section F. Definitions, Breakdown**, Breakdown does NOT mean or include any of the following:
>
> a. Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification; however, if a "Breakdown" to "Covered Equipment" ensues, we will pay the ensuing loss or damage not otherwise excluded[.]

(EB Policy, at EB_XL_0000100.)

37. The EB Insurers argue that because there was no direct physical loss or impairment constituting a Breakdown in either the Subject Encoder or the DCS, there is no coverage available under the EB Policy as a matter of law. (EB Ins. Br. Supp. 1–2.) The Court addresses the Subject Encoder and the DCS separately, below.

### 1. The Subject Encoder

38. The EB Insurers argue that, when tested, the Subject Encoder operated as intended. They contend that both parties' experts were present when the Subject Encoder was disassembled, and no evidence of "direct physical loss or impairment" was discovered. (EB Ins. Br. Supp. 18.) The EB Insurers also observe that the weight discrepancy resurfaced again after the incident, even with the Replacement Encoder in place. They conclude, therefore, that the discrepancy must have been caused by

something other than the Subject Encoder. (EB Ins. Br. Supp. 19.) The EB Insurers maintain that, at best, Nucor describes an excluded malfunction of the Subject Encoder, and that without evidence of a direct physical loss or impairment, Nucor's claims cannot survive summary judgment. (EB Ins. Br. Supp. 18, 27.)

39. Nucor responds that imaging of the inside of the Subject Encoder revealed multiple indentations on the surface of the photoemitter/sensor housing. According to Nucor's expert, Dr. Shukri Souri, the indentations are evidence that a slotted disc that rotates inside the Subject Encoder impacted the encoder's housing, producing particulates that ultimately caused the Subject Encoder to suffer an electrical failure. (Br. Opp'n EB Ins. Mot. Ex. A [Souri Decl. & Reports], ECF No. 303.1; EB Ins. Mot. Ex. CC [Souri Dep. Excerpt], ECF No. 268.29; Prop. Ins. Mot. Ex. P 87:20–89:16, 92:16–19 [Souri Dep.], ECF No. 276.) Nucor argues that this electrical failure satisfies the EB Policy's definition of a Breakdown. (Br. Opp'n EB Ins. Mot. 12–15, ECF No. 300 [Nucor Br. Opp'n EB Ins. Mot.].)

40. The EB Insurers point to the testimony of James Bearden, a Nucor technician, in which he admits that on 7 November 2017, he opened the Subject Encoder's housing. (Bearden Dep. 32:15–19.) As a result of Bearden's actions, the EB Insurers argue, it is now impossible to determine whether there were particulates inside the Subject Encoder that caused it not to function. By allowing the Subject Encoder to be opened, the EB Insurers believe Nucor spoliated evidence and should not be permitted to present its "loose particulate" theory. (EB Ins. Br. Supp. 22.)

41.  "Spoliation occurs where a party '(1) intentionally destroy[s] or fail[s] to preserve (2) potentially relevant materials (3) while aware of the possibility of future litigation.'" *Chesson v. Rives*, 2017 NCBC LEXIS 218, at *5 (N.C. Super. Ct. Jan. 18, 2017). If a party believes that another party has spoliated evidence, it may request an instruction that the factfinder infer that the evidence would have been adverse to the spoliating party. *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 185 (2000). To receive the adverse inference instruction, however, the requesting party must show that the alleged spoliator "was on notice of the claim or potential claim at the time of the destruction." *Id.* at 187.

42.  The Court cannot conclude based on the record before it that, at the time he acted, Mr. Bearden was (a) on notice of Nucor's intention to file a claim and (b) acted intentionally to destroy evidence. To the contrary, there is no record evidence that when he opened the Subject Encoder, Nucor was considering a claim. Further, the evidence presented indicates that Bearden, along with other Nucor personnel, appeared focused on getting the R6-C04 weigh belt feeder system back online. (EB Ins. Mot. Ex. DD [Nucor Work Order Report], ECF No. 268.30.) Bearden also testified that he opened the Subject Encoder because he "was just curious to see what it looked like." (Bearden Dep. 32:15–25.)

43.  Even if an adverse inference instruction were appropriate in this case, it would not require a factfinder to disregard Dr. Souri's opinion, as the EB Insurers argue. *Holloway v. Tyson Foods, Inc.*, 193 N.C. App. 542, 547 (2008) ("Even if a party presents evidence of spoliation sufficient to give rise to an adverse inference, that

inference is permissive, not mandatory." (citation modified)).  Therefore, the Court shall consider Dr. Souri's opinion in its analysis.

44.     The EB Insurers next contend that the Subject Encoder experienced a calibration issue, a malfunction that is exempt from coverage.  (EB Ins. Br. Supp. 27; *see* EB Policy, at EB_XL_0000100.)  While there is evidence that Nucor technicians attempted to calibrate the Subject Encoder in response to the weight discrepancy, there is also evidence that the weight discrepancy persisted despite the calibration. (Rambin Dep. 23:8–18, 25:3–11; Bearden Dep. 26:12–27:2.)  Therefore, fact issues prevent the malfunction exclusion (Endorsement #13) from being determinative at this stage.

45.     In addition, competing expert opinions with respect to the physical integrity of the Subject Encoder raise material issues for a factfinder.  As discussed above, Dr. Souri, Nucor's expert, opines that the Subject Encoder experienced an electrical failure.  (Souri Dep. 67:2–68:17.)  He testified that repeated impact by the slotted wheel on the Subject Encoder's housing created loose particulates that caused an electrical failure.  (Souri Dep. 67:5–68:17, 93:16–94:1, 99:8–100:22.)[7]

46.     The EB Insurers' expert, Mr. Randy Kent, disagrees.  Mr. Kent argues that the indentations Dr. Souri observed on the Subject Encoder's housing were not abrasions but rather were benign particulates from the manufacturing process that stuck to the housing.  (EB Ins. Mot. Ex. AA, ECF No. 268.27 [Kent Report].)  He

---

[7] Dr. Souri also testified that the Nucor technicians' troubleshooting efforts sufficiently ruled out other possible causes of the weight discrepancy and narrowed the problem to the Subject Encoder.  (Souri Dep. 47:7–49:21.)  He testified that installing the Replacement Encoder resolved the weight discrepancy.  (Souri Dep. 55:10–23.)

opines that the particulates had no effect on the Subject Encoder's performance and observes that (a) similar markings appear on the "exemplar encoder" used during testing performed in 2022 and (b) neither the Subject Encoder nor the exemplar encoders—one purchased for testing in 2018 and another for testing in 2022—demonstrated any impairment during testing. (*See* Kent Report 24–28, 34–41.) In addition, according to Mr. Kent, the gap that exists between the slotted disc and the housing makes Dr. Souri's theoretical impact impossible. (Kent Report 43.)

47. Thus, material fact issues about the physical integrity of the Subject Encoder preclude summary judgment in favor of the EB Insurers based on whether it suffered a Breakdown as defined by the EB Policy.

48. Going a step further, however, the EB Insurers argue that even if a Breakdown of the Subject Encoder occurred, that alleged Breakdown was not the cause of the solidification incident that resulted in the claimed loss. (EB Policy, at EB_XL_0000053 ("This Policy covers *direct damage* to 'Covered Property' *resulting from* a 'Breakdown' to 'Covered Equipment[.]' " (emphasis added)); EB Ins. Br. Supp. 26.)[8]

49. The EB Insurers maintain that it was the decision of Nucor plant personnel to shut the system down and swap out a surge bin—not replacing the Subject Encoder—that caused the cement coating system to default to a zero-kilogram output.

---

[8] The EB Policy uses the word "direct" a second time when defining "Breakdown": " 'Breakdown' means the following direct physical loss or impairment that causes damage to or results in the shutdown of 'Covered Equipment' and necessitates its repair or replacement." (EB Policy, Endorsement #8, at EB_XL_0000053; *see* EB_XL_0000077, EB_XL_0000093.)

Replacing the Subject Encoder with the Replacement Encoder merely caused the system to shift from automatic to manual mode. In manual mode, the system maintained the last-known cement output setting. If the operator had not shut down the system to allow the technicians to swap the bins, the EB Insurers contend, the system would have retained the correct cement output setting, the ore would have been properly coated, and the solidification incident would not have occurred. (EB Ins. Br. Supp. 26–27.)

50. While admitting that "[i]t was the combination of those two factors [the shift to manual mode and the default to a zero-kilogram output] that led to uncoated iron [ore] flowing into the reactor[,]" the EB Insurers maintain that only one of those events [the shift to manual mode] was prompted by the alleged impairment of the Subject Encoder and removal of the Replacement Encoder. They conclude, therefore, that there is no *direct* causal chain between the alleged failure of the Subject Encoder and Nucor's loss. (EB Ins. Br. Supp. 26–27.)

51. Nucor responds that the EB Insurers fail to cite any policy language requiring a "direct causal chain" between a Breakdown and its loss. They argue that the "EB Insurers—as drafters of the policy language—could have included a 'directness' element or a requirement that the solidification result *solely* from a Breakdown if they [had] wanted to. But they didn't." (Nucor Br. Opp'n EB Ins. Mot. 28.) In Nucor's words, "[t]he failure of the Subject Encoder led to the solidification. Had the Subject Encoder not failed, the Replacement Encoder would

not have been removed, and the DCS would not have suffered an [electronic circuitry impairment]." (Nucor Br. Opp'n EB Ins. Mot. 29.)

52.     As the EB Insurers argue, the policy uses the word "direct" to modify "damage." A Breakdown to Covered Equipment must *result* in *direct damage*. (EB Policy, at EB_XL_0000053.) In other words, to be covered, Nucor must be able to trace the claimed damage directly to a Breakdown of the Subject Encoder.

53.     Nucor's position is that it has done just that. Pointing to the effect of the sequence of events on the DCS, Nucor argues that "[t]he failure of the Subject Encoder led to the solidification. Had the Subject Encoder not failed, the Replacement Encoder would not have been removed, and the DCS would not have suffered an ECI." (Nucor Br. Opp'n EB Ins. Mot. 29.)

54.     In support of its argument, one of Nucor's Rule 30(b)(6) witnesses, Mr. Michael Price, testified that, after the surge bins were swapped, the DCS operator attempted to restart the system in automatic mode. However, his direction was overridden by the effect of the bad status signal resulting from the removal of the Replacement Encoder, and the system remained in manual mode. (Price Dep. 61:1–66:5, 154:8–166:21.) This override, Nucor contends, was a Breakdown of the DCS in the form of an ECI. (Nucor Br. Opp'n EB Ins. Mot. 24–25.)

55.     The Court disagrees. As discussed below, the record in this case reveals that Nucor personnel made decisions that directly influenced the outcome about which Nucor complains. When the weigh belt experienced a discrepancy (that Nucor attributes to a Breakdown of the Subject Encoder), Nucor technicians responded by

replacing it, not with a spare but by removing another encoder from the line without a full appreciation for the effect their decision would have on the DCS. Beyond that decision, which apparently remedied the encoder problem, Nucor technicians decided to shut the system down and swap out a surge bin, again without appreciating the impact of that decision on the DCS in its then state. Finally, when the line was restarted and the cement coating system did not automatically revert to the proper setting, the record reflects that the DCS operator failed to interpret multiple indications on his screen signaling a problem for more than seven hours, until his replacement took over. (Nucor Root Cause PowerPoint 20–21.) Therefore, even if the Subject Encoder either experienced a Breakdown or its replacement caused one in the DCS, the record reflects that there was no *direct* physical loss that caused the damage.

56. To repeat, the Policy covers "*direct damage* to 'Covered Property' *resulting from* a 'Breakdown' to 'Covered Equipment[.]'" Endorsement #8 requires that, to have a Breakdown, Nucor must present evidence of a *direct* physical loss that caused damage to or resulted in the shutdown of Covered Equipment and necessitated its repair or replacement. There is no escaping that the term *"direct* physical loss" is a reference to causation. *See N. State Deli, LLC*, 386 N.C. at 740, 742 ("'Direct' is characterized by 'a close esp[ecially] logical, *causal,* or consequential relationship' or marked by the '*absence of an intervening* agency, instrumentality, or *influence.*'" (quoting *Direct*, Webster's Third New International Dictionary 640 (2002) (emphasis added))).

57. Thus, whether the Subject Encoder itself failed, a disputed fact, does not control the outcome here. To fully address Nucor's argument, the Court next turns to evidence regarding the effect of replacing the Subject Encoder on the DCS.

2. The DCS

58. The EB Insurers maintain that the DCS did not suffer a Breakdown, as defined by the policy, because Nucor has admitted that it worked as it was programmed to work in response to Nucor's deliberate removal of the Replacement Encoder. (Nucor Root Cause PowerPoint 3–4; Price Dep. 186–87 ("The way the integrat[o]r[9] performed after the removal of the encoder is the way it was programmed to respond by the manufacturer."); Lynch Dep. 70:21–71:9 ("Q. [S]etting to manual and holding the last known value, that's how the system is meant to operate, correct? A. Yes."); EB Ins. Mot. Ex. B [Nucor Letter to Carter], ECF No. 268.2 ("After the first encoder was replaced, the equipment operated as designed and intended.").) The DCS switched from automatic to manual mode, in accordance with its software. According to the EB Insurers, the fact that Nucor personnel did not understand that the program would operate this way or notice the change for seven hours amounts to human error, not to a Breakdown. (EB Ins. Br. Supp. 23–26.)

59. Nucor contends that Endorsement #8 does not require the DCS to operate contrary to its programming for a Breakdown in the form of an ECI to exist. (Nucor Br. Opp'n EB Ins. Mot. 24–25.) Relying on the EB Policy's definition of Electronic

---

[9] The integrator is the device that sent the bad status signal to the DCS when the Replacement Encoder was removed. (Price Dep. 32:16–33:19.)

Circuitry Impairment, Nucor maintains that the evidence proves that a "fortuitous event involving 'electronic circuitry' within 'covered equipment' " caused the DCS "to suddenly lose its ability to function as it had been functioning immediately before such event[,]" meeting the definition of a Breakdown. (Nucor Br. Opp'n Ins. Mot. 24–25.)

60.     Specifically, Nucor argues that encoders are microelectronic components included in the definition of Electronic Circuitry. (*See* Souri Decl. & Reports, Initial Report at 13; Price Dep. 184:24–186:6.) It contends that a fortuitous event occurred when Nucor's technicians observed a weight discrepancy that they resolved by replacing the Subject Encoder with the Replacement Encoder. This action resulted in the DCS receiving a bad status signal, which in turn caused the cement ratio controller to shift to manual mode. Nucor concludes that the bad signal status caused a sudden loss of the DCS's ability to function as it had been functioning. (Nucor Br. Opp'n EB Ins. Mot. 22–25.)

61.     The EB Insurers respond first that the weight discrepancy and replacement of the Subject Encoder did not involve Electronic Circuitry. They argue further that removal of the Replacement Encoder was not fortuitous because Nucor's technicians did it intentionally as part of their efforts to fix the problem. As for the DCS, the EB Insurers contend that the switch to manual mode was not a loss of function but rather was a programmed response resulting from the removal of the Replacement Encoder. Finally, the EB Insurers argue that the policy specifies that an ECI excludes conditions that can be reasonably remedied by "updating software," which is what

they argue Nucor did when it added interlocks to the program after the incident. (EB Ins. Reply 9–10; EB Ins. Br. Supp. 23–25.)

62.     The Court agrees with the EB Insurers. For coverage to exist, a fortuitous event involving Electronic Circuitry must cause the DCS to suddenly lose its ability to function as it had been functioning immediately before that event. A "fortuitous event" is one that is unforeseen and over which an affected person has no control. *See Fortuitous Event*, The Law Dictionary, https://thelawdictionary.org/fortuitous-event/ (last visited June 10, 2025); *see also Fortuitous Event*, Merriam-Webster, https://www.merriam-webster.com/legal/fortuitous%20event (last visited June 10, 2025) (defining "fortuitous event" as "an event of natural or human origin that could not have been reasonably foreseen or expected and is out of the control of the persons concerned (as parties to a contract)").

63.     Here, the parties agree that the removal of the Replacement Encoder caused the DCS to shift from automatic to manual mode. In addition, shutting down the line to swap surge bins caused the cement coating system's output to default to zero kilograms. Both actions were intentional and within the control of Nucor personnel. While it is true that Nucor personnel did not anticipate the consequences of their actions, that fact does not make those events fortuitous.[10] Moreover, the events did not cause the DCS to lose its *ability* to function as it previously had. Both

---

[10] The EB Insurers also contend that, to the extent Nucor suggests that the DCS acted contrary to its programming, the DCS suffered an excluded malfunction. (EB Ins. Br. Supp. 27.) However, Nucor does not argue that the DCS operated contrary to its programming. (Nucor Br. Opp'n EB Ins. Mot. 31.)

before and after the events described, the DCS operated in accordance with its programming.

64.     Accordingly, because the evidence presented does not support Nucor's contention that the DCS suffered a Breakdown in the form of an ECI, the Court **GRANTS** the EB Insurers' Motion with respect to Nucor's breach of contract and declaratory judgment claims, and **ENTERS JUDGMENT** in favor of the EB Insurers declaring that there is no coverage under the EB Policy because no Breakdown, as defined in the EB Policy, occurred.[11]

## B.     Nucor's UDTPA claim

65.     Nucor's UDTPA claim is premised on alleged unfair claim settlement practices as defined in section 58-63-15(11) of the North Carolina General Statutes. It contends that the EB Insurers refused to pay Nucor's claim without conducting a reasonable investigation of the DCS and that they failed to promptly provide a reasonable explanation for the denial. (Nucor Br. Opp'n EB Ins. Mot. 31–34.)[12] It has presented evidence that the EB Insurers' loss adjuster, Mr. David Lofton, admitted that the EB Insurers "never actually did any type of investigation into the

[11] When addressing the Property Insurers' motion, Nucor argues that the DCS's switch to manual mode was a computer programmed risk mitigation strategy that allowed the DRI process to continue without interruption when an encoder was removed. (Nucor Br. Opp'n Prop. Ins. Mot. 17–18; *see* Souri Decl. & Reports.) Nucor admits that it relied on operator logic to override this programmed logic when necessary. Unfortunately, Nucor discovered that its reliance on "human frailty," as its counsel put it, was not fail proof.

[12] Nucor does not argue that the EB Insurers failed to investigate a Breakdown of the Subject Encoder. (*See* Nucor Br. Opp'n EB Ins. Mot. 10 ("EB Insurers, through Mr. Lofton and . . . Mr. Kent, investigated the encoder issues. But as for the DCS incident, they 'never actually did any type of investigation.' ").)

control room where it all happened[,]" (Nucor Br. Opp'n EB Ins. Mot. Ex. I 48:10–19 [Lofton Dep.], ECF No. 303.9), and when asked whether he or his team analyzed the DCS issues, he replied: "No, not at all," (Lofton Dep. 72:16–20). Lofton also testified that investigating the DCS was not within the EB Insurers' consultant, Mr. Kent's, scope of work. (Lofton Dep. 48:21–49:4, 63:3–21.) Nucor attributes the EB Insurers' allegedly improper focus on the encoder alone to its desire to subrogate against the encoder's manufacturer. (Nucor Am. Countercls. Intervening-Compl. Pls. ¶ 28.)

66. The EB Insurers respond that this argument is no more than an "attorney-crafted" diversionary tactic to support a nonexistent claim. (EB Ins. Reply 12.) Citing *Defeat the Beat, Inc. v. Underwriters at Lloyd's London*, 194 N.C. App. 108, 117 (2008), they argue that they did not investigate the DCS because there was no Breakdown to investigate. The EB Insurers conclude that because there was no Breakdown of the DCS, and therefore no coverage under the EB Policy, Nucor cannot establish the damages element of its UDTPA claim. (EB Ins. Br. Supp. 28–30; EB Ins. Reply 12.)

67. This conclusion is underscored, the EB Insurers contend, by the fact that Nucor's own root cause analysis revealed that the DCS operated as it was programmed to operate, (*see* Nucor Root Cause PowerPoint 25–27), and a lack of evidence that Nucor asked the EB Insurers to investigate the DCS, (EB Ins. Reply 12; *see* EB Policy, at EB_XL_0000067 ("Proving your loss is your responsibility.")). In short, because Nucor did not report a "Breakdown" of the DCS, the EB Insurers maintain that they had no duty to investigate it. (EB Ins. Br. Supp. 28–29; EB Ins. Reply 12.)

68. Proving a UDTPA violation requires evidence that "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 277 (2023). "A trade practice is unfair if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers. A trade practice is deceptive if it has the capacity or tendency to deceive." *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 61–62 (1992) (citation modified).

69. Proving a breach of contract alone is not enough. *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 298 (2012) ("It is well recognized that . . . a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UDTPA]."); *Branch Banking & Tr. Co.*, 107 N.C. App. at 62 ("A plaintiff must show substantial aggravating circumstances attending the breach to recover under [the UDTPA]." (citation modified)).

70. On the other hand, when a UDTPA claim is based on evidence that is also offered in support of a breach of contract claim and the breach of contract claim fails, so too does the UDTPA claim. *Cf. Krawiec v. Manly*, 370 N.C. 602, 613 (2018) (discussing how reliance upon unsuccessful claim underpinning UDTPA claim resulted in dismissal of the UDTPA claim).

71. Such is the result here. Given that no Breakdown of the DCS occurred, there could be no damage caused by the EB Insurers' alleged failure to investigate a nonexistent event. *See Defeat the Beat*, 194 N.C. App. at 115–17 (plaintiff who only

showed "uninsured loss" did not establish damages element of UDTPA claim); *see also* *Pinney*, 146 N.C. App. at 256–57 (plaintiff not entitled to coverage could not establish damages element of UDTPA claim). Because Nucor cannot present evidence to establish a required element of its claim, the EB Insurers' Motion for Summary Judgment with respect to Nucor's UDTPA claim shall be **GRANTED.**[13] There being no viable claim against the EB Insurers, Nucor's Motion for Partial Summary Judgment against the EB Insurers shall be **DENIED** as moot.

## II.   The Property Insurers' and Nucor's Cross-Motions for Summary Judgment

72.   The Property Insurers request that the Court grant summary judgment in their favor as to their Counts I (Faulty Design Exclusion) and V (coverage for Business Interruption/Extra Expense,) and summary judgment against Nucor with respect to Nucor's counterclaims for breach of contract and declaratory relief.[14] (Prop. Ins. Mot. 2; Pls.' Br. Supp. Mot. Summ. J. 1, ECF No. 271 [Prop. Ins. Br. Supp.].)

73.   Conversely, Nucor moves for an order dismissing the Property Insurers' request for a declaration that Nucor's claims are precluded by either the Property Insurers' faulty design exclusion (Count I) or its inherent or latent defect exclusion

---

[13] The EB Insurers also move for an award of court costs and expenses, as well as attorneys' fees, but they do not brief the issue. Consequently, the Court **DENIES** this aspect of the EB Insurers' Motion without prejudice. *See* BCR 7.2.

[14] The Property Insurers observe that if summary judgment is granted in their favor as to Counts I and V of their Complaint and both of Nucor's counterclaims, Counts II and IV of their Complaint will be rendered moot. (Pls.' Br. Supp. Mot. Summ. J. 2 n.1, ECF No. 271 [Prop. Ins. Br. Supp.].) They voluntarily dismissed Count III (seeking a declaratory judgment that Product Undergoing Work was not Covered Property) on 21 August 2024, after the hearing. (Not. Vol. Dism. Without Prej., ECF No. 322.)

(Count II). It also seeks dismissal of the Property Insurers' request for a declaration that Nucor's claim for business interruption and extra expense (Count V) is barred because Nucor cannot establish physical loss or damage. (Nucor Mot. Prop. Ins. 2–3.)

74. Each of the Property Insurers issued an insurance policy to Nucor for the period 1 January 2017 to 1 January 2018. (Prop. Policies 1; Prop. Ins. Br. Supp. 10.) The Property Policies provide in part:

**6. Insuring Agreement**

This policy insures against all risks[15] of direct physical loss or damage, except as excluded, to covered property while on Described Premises or on land within 1,000 feet thereof and while in the due course of Transit, provided such physical loss or damage occurs during the term of this policy.[16]

. . .

**Time Element Section**

**1. Business Interruption**

Subject to all its provisions this Policy covers against the loss resulting only from necessary interruption of business conducted by the Insured caused by direct physical loss or damage by the peril(s) insured against during the term of this Policy to real and personal property including while in Transit.

---

[15] " 'All-risk' . . . insurance is a type of property insurance that protects property loss or damage from any peril, unless the peril is expressly excluded." *N. State Deli, LLC*, 386 N.C. at 736 (citing *Open Perils Insurance*, Black's Law Dictionary (12th ed. 2024)). As such, if the policy's exclusions are inapplicable, the insured's loss is insurable. *See id.* All-risk insurance "is more protective for insureds because it covers imagined and unimagined perils, so a business need not guess in advance what misfortune might befall it." *Id.* at 736–37 (citation omitted).

[16] (*See, e.g.*, Compl. Ex. A, at 1 [Aspen Prop. Policy]; *see also, e.g.,* Compl. Ex. B, at 1 [Endurance Prop. Policy]; Prop. Policies 1.)

. . .

**4. Extra Expense**

The necessary Extra Expense incurred by the Insured in order to continue as nearly as practicable the Normal operation of the Insured's business following direct physical loss or damage of the type insured against to real or personal property of the type covered, located on Described Premises and while in Transit.[17]

. . .

**General Policy Conditions Section**

**1. Exclusions**

A. **Causes of Loss** – This policy does not insure against loss or damage caused by any of the following, regardless of any other cause or event, whether or not insured under this policy, or away from described premises, contributing concurrently or in any other sequence to the loss or damage:

  i.     animals, vermin or insects unless physical damage not otherwise excluded by this policy results, and then the Insurer shall be liable for only such resulting physical damage;

. . . [.]

B. **Types of Loss or Damage** – This policy does not insure against the following types of loss or damage:

  i.    a.    indirect or remote loss or damage;

        b.    delay or loss of market;

        c.    time element loss not otherwise defined or provided herein.

  ii.   a.    faulty workmanship, material, construction or

---

[17] (Prop. Policies 19.)

design; or

> b. inherent or latent defect.

> unless such loss or damage results directly from other physical damage not otherwise excluded in this policy[.]

(Prop. Policies 24.)

75. Count I of the Property Insurers' Complaint seeks a declaration that Nucor's loss is precluded from coverage by virtue of the faulty design exclusion. (Compl. ¶¶ 37–41.) Count II of the Complaint seeks a declaration that Nucor's loss is precluded from coverage because of the inherent or latent defect exclusion. (Compl. ¶¶ 42–46.) Count V of the Complaint seeks a declaration that Nucor's claim for business interruption and extra expense coverage is barred because Nucor cannot establish direct physical loss or damage to its property of the type insured against. (Compl. ¶¶ 63–64.) The Court addresses each count below.

76. The meaning of language in an insurance policy presents a question of law for the Court. *N. State Deli, LLC*, 386 N.C. at 740 (2024) (citing *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020)). Our Supreme Court recently articulated the law in this regard:

> As with all contracts, the goal of interpreting a contract for insurance is to arrive at the intent of the parties when the policy was issued. In doing so, the plain language of the policy controls. Terms that are defined in a policy should be given that definition. Undefined words are given their ordinary meaning consistent with the context in which the term is used. One way of understanding ordinary meaning is to consult standard, nonlegal dictionaries.

*Id.* (citation modified).

77.     If the language is ambiguous and "fairly and reasonably susceptible to either of the constructions for which the parties contend, it should be construed against the insurance company and in favor of the policyholder." *Id.* at 741 (citation modified). That means that the Court liberally construes policy provisions "that extend coverage . . . whenever possible by reasonable construction and strictly construe[s] against an insurance company those provisions excluding coverage[.]" *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 9–10 (2010) (citation modified); *see also N.C. Farm Bureau Mut. Ins. Co. v. Stox,* 330 N.C. 697, 702 (1992). Whether a contract's language is ambiguous is a question of law for the Court. *Morse Mgmt. v. Morse Clinic of Hillsborough,* 2018 NCBC LEXIS 158, at *27 (N.C. Super. Ct. Feb. 19, 2018) (citing *Lynn v. Lynn*, 202 N.C. App. 423, 432 (2010)).

78.     The Supreme Court has explained that these interpretive principles "reflect the reality of the parties' respective bargaining power: insurance companies prepare the policies and choose what language to use." *N. State Deli, LLC*, 386 N.C. at 741 (citing *O'Grady v. First Union Nat'l Bank*, 296 N.C. 212, 227 (1978)).

79.     On the other hand, where the *insured* prepares a manuscript policy that it then puts on the market for bid, concerns about bargaining power shift. In that event, the drafter is the insured, and application of general principles results in ambiguities being construed against the insured. *O'Grady*, 296 N.C. at 227 ("[T]he terms of a written contract are to be construed most strongly against the party who drafted the instrument."); *see Port Auth. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("One of the frequently cited reasons for interpreting language in favor of

the insured is that insurance policies are generally contracts of adhesion, which offer little choice to the purchaser. This justification, though, has little application in this case. As is often the situation with large, knowledgeable business firms, the contracts were manuscript policies negotiated and drafted by the insured."); 2-6 Appleman on Insurance Law & Practice Archive § 6.1 (2d ed. 2011) ("[I]t has been held that where it was the insured who insisted upon the form of the insurance contract used, the principle that the form should be construed most strongly against the insurer is inapplicable.").

80. Finally, the Court will not impose on an insurance company liability it did not assume and for which the policyholder did not pay. *Accardi*, 373 N.C. at 295.

## A. Direct Physical Loss or Damage

81. The Property Insurers argue that for Nucor's property damage and time element losses to be covered, there must have been "direct physical loss or damage." (Prop. Ins. Br. Supp. 18–19.) They contend that "direct physical loss or damage" requires a tangible alteration of covered property and argue that Nucor has admitted that it has not made a claim for physical loss or damage to either the Subject Encoder or the Replacement Encoder. (Prop. Ins. Br. Supp. 19–20; Prop. Ins. Br. Opp'n Nucor Mot. 21–22; *see* Nucor Br. Opp'n Prop. Ins. Mot. 21 & n.82.)

82. The Property Insurers further contend that their conclusion that the DCS suffered no physical loss or damage is evidenced by the fact that a Nucor employee, with knowledge of how the program worked, remedied the bad status signal with a few keystrokes. (Prop. Ins. Br. Supp. 20.) Finally, the Property Insurers contend

that Nucor's reactor was not physically damaged but simply had to be cleaned out. (Prop. Ins. Br. Supp. 18–19.)

83.     After briefing in this matter was complete, the Supreme Court of North Carolina decided *North State Deli, LLC v. Cincinnati Insurance Co.*, 386 N.C. 733 (2024).   In that case, our Supreme Court explained that use of the term "direct physical loss" in the policies before it was ambiguous and could encompass the insured's loss of use and access to property as a result of government orders.  *See N. State Deli, LLC*, 386 N.C.at 743 (" 'Physical' means material, as opposed to mental, moral, spiritual, or imaginary. *Physical*, Webster's Third New International Dictionary 1706. 'Loss' means a deprivation, failure to keep possession, or the state or fact of being destroyed. . . . Property 'loss' surely occurs when it is no longer usable for its insured purpose[.]" (citation omitted)).[18]   Thus, in some circumstances a physical loss can be one that is material, such as loss of use of property, regardless of whether it is also tangible.  *N. State Deli, LLC*, 386 N.C.at 743.

---

[18] Our Supreme Court addressed a similar phrase, "direct physical loss of or damage," in *Cato Corp. v. Zurich American Insurance Co.*:

> Both policies rely on the operative phrase "direct physical loss" without defining that term, so it must be given its ordinary meaning.  Both make use of the conjunctive "or," as in the phrase "direct physical loss of or damage" to property, so direct physical loss must have a distinct and possibly broader meaning than physical damage in order to give effect to both phrases. And both contain a set of exclusions that suggest a broader meaning of "direct physical loss" of property. Here, for example, Cato's policy excludes "delay, loss of market, or loss of use." Those exclusions suggest the scope of "direct physical loss" of property is broader than physical tangible alteration to property, or else they need not be mentioned as exclusions to begin with.

386 N.C. 667, 672–73 (2024) (citation modified).

84. In the instant case, while the DCS continued to be available to Nucor throughout the time in question, the reactor did not. The undisputed evidence is that Nucor lost the use of its reactor for several weeks. (Pls.' Resp. Br. Opp'n Nucor Mot. Partial Summ. J. Ex. U 27:21–28:22 [Levanduski Dep.], ECF No. 302; Nucor Mot. Prop. Ins. Ex. D 148:3–12 [Lexington Dep.], ECF No. 280.4; EB Ins. Mot. Ex. T [Lofton Report], ECF No. 268.20.)

85. But Nucor's loss of use of its reactor is not the only basis for concluding that physical loss occurred. Unlike the insured in *North State Deli,* here Nucor presents evidence of tangible harm. Its witness, Mr. Levanduski, testified that the solidified ore swelled, causing excessive pressure that damaged the mortar joints inside the reactor, which then required repair. (Nucor Mot. Prop. Ins. Ex. E ¶¶ 4(b)–(d) [Levanduski Decl.], ECF No. 280.5.)[19] Nucor also presents evidence that the ore removal process altered the internal dimensions of the reactor, requiring repair before it could be recertified as a pressure vessel and put back into operation. (Lynch Dep. 141:25–142:4; Levanduski Decl. ¶ 4.))

86. The Property Insurers argue that courts in other jurisdictions have found that direct physical loss or damage does not occur when property can be restored to its former condition by cleaning it. (Prop. Ins. Br. Opp'n Nucor Mot. 25); *see Mama Jo's, Inc. v. Sparta Ins. Co.*, 823 F. App'x 886, 871, 879 (11th Cir. 2020) (no coverage when dust pans, hoses, and towels were used to remove debris from property); *Universal Image Prods. v. Fed. Ins. Co.*, 475 F. App'x 569, 574 n.8 (6th Cir. 2012) (no

---

[19] The Court addresses the Property Insurers' motion to strike Levanduski's declaration below.

coverage when hot water and household cleaning items could be used to remove mold or bacteria from personal property); *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23, 41 (2008) (no coverage when wood staining could be removed with bleach solution). But Nucor responds that characterizing what had to be done to its reactor to recertify it and put it back in operation as mere "cleaning" is a gross understatement. (Reply Br. Supp. Nucor Mot. Prop. Ins. 13–14, ECF No. 317 [Nucor Reply Mot. Prop. Ins.].)

87. As the Property Insurers' corporate representative recognized, Nucor "had to cut [the reactor] open and[—]to repair it, to clean it out, and to patch it up afterwards." (Nucor Mot. Prop. Ins. Ex. D 155:13–15 [Lexington Dep.], ECF No. 280.4.) The "repair protocol," as the Property Insurers' adjuster explained, included "open[ing] up the sides of the reactor and us[ing] air hammers or chisels" to remove the ore. (Nucor Mot. Prop. Ins. Ex. G 122:25–123:7 [Carter Dep.], ECF No. 280.7 ("And once [the reactor] cooled down, which took some time, then the repair protocol was to actually open up [the] sides of the reactor and use air hammers or chisels or whatever other–I forget–they probably got it in more detail–but, basically, all that had to be chiseled out. And then all that was put back together, and the plant resumed operation.").) In all, the evidence establishes that a physical loss occurred with respect to the reactor.

88. Even so, the Property Insurers argue that harm to the reactor was caused by the DCS's defective or faulty programming—risks that the Property Insurers contend are specifically excluded by their policies. (Prop. Ins. Reply 9–11.) Nucor

disagrees that the policy language requires a look at causation. (Nucor Br. Opp'n Prop. Ins. Mot. 12–15; Br. Supp. Nucor Mot. Partial Summ. J. Pls. 16, ECF No. 279 [Nucor Br. Supp. Mot. Prop. Ins.].) The Court need not resolve this aspect of the parties' dispute because, as discussed below, the plain language of the faulty design and inherent defect exclusions establishes that neither applies.

### B. The Faulty Design and Inherent or Latent Defect Exclusions

89. The Property Policies exclude from coverage certain "Causes of Loss" and "Types of Loss or Damage." Items under the "Causes of Loss" exclusion include, for example, "animals, vermin or insects[.]" Items under the "Types of Loss or Damage" exclusion include "indirect or remote loss or damage," "faulty workmanship, material, construction or design," and "inherent or latent defect." (*See* Prop. Policies 24.) Otherwise, the Property Policies do not define what constitutes a *cause* of loss as opposed to a *type* of loss. (*See* Prop. Policies 24, 33–37.) The parties differ in their interpretation of this language.

90. The Property Insurers maintain that the language of the exclusions is unambiguous. They argue that "Types of Loss or Damage" should be interpreted broadly to exclude from coverage all losses caused by a faulty design or inherent or latent defect; whereas "Causes of Loss" is limited by caveats. They argue that the only difference between the "Causes of Loss" and "Types of Loss or Damage" exclusions is that the latter includes an ensuing loss clause, (*see* Prop. Policies 24 ("unless such loss or damage results directly from other physical damage

not otherwise excluded in this policy")), while the former does not. (Pls.' Resp. Br. Opp'n Nucor Mot. 13–14, ECF No. 301 [Prop. Ins. Br. Opp'n Nucor Mot.].)

91.  Nucor agrees that the Property Policies are all risk policies and the language of their exclusions is plain and unambiguous; however, it reads them differently. In Nucor's view, because the faulty design and inherent or latent defect exclusions are identified as excluded *types* of losses, they exclude only the cost of remediating the faulty design or inherent defect itself. (Nucor Br. Supp. Mot. Prop. Ins. 13–14.) Because it does not seek reimbursement for repairing its DCS, Nucor concludes that its claim is not excluded. (Nucor Br. Supp. Mot. Prop. Ins. 16–17.)

92.  The Property Insurers respond that Nucor's construction of the relevant language is so narrow that it eliminates the faulty design and inherent or latent defect exclusions altogether. (Prop. Ins. Br. Opp'n Nucor Mot. 14; Prop. Ins. Reply 9.) They argue that the "Types of Loss or Damage" provision is broader than the "Causes of Loss" provision. According to the Property Insurers, the "Types of Loss or Damage" provision excludes from coverage losses *regardless of their cause* and therefore includes losses caused by a faulty design or inherent or latent defect. (*See* Prop. Ins. Br. Opp'n Nucor Mot. 15; Prop. Ins. Reply 15.)

93.  The Court concludes that the language in the Property Policies is unambiguous, and that Nucor is correct in its interpretation. Both the faulty design and inherent or latent defect exclusions appear under the "Types of Loss or Damage" subheading, not the "Causes of Loss" subheading. By purposefully dividing the

exclusions into two categories, the drafter made clear its intention that they be considered separately.

94. A "cause" of loss is "something that brings about" a loss. *See Cause*, Merriam-Webster, www.merriam-webster.com/dictionary/cause (last visited June 17, 2025). A "type" of loss is "a particular kind, class, or group" of loss. *See Type*, Merriam-Webster, www.merriam-webster.com/dictionary/type (last visited June 17, 2025). Contrary to basic rules of contract interpretation, the Property Insurers' understanding of these provisions would render the distinction between "type" and "cause" meaningless. Further, the causation language—included with the "Causes of Loss" exclusions ("This policy does not insure against loss or damage *caused by* any of the following, regardless of any other cause")[20]—and notably absent from the "Types of Loss or Damage" exclusion—would lose meaning. *See S. Seeding Serv., Inc. v. W.C. English, Inc.*, 217 N.C. App. 300, 305 (2011) (stating that "an interpretation which gives a reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing useless or superfluous").

95. The difference between the two types of exclusions is also evident when their ensuing loss clauses are considered. The "Causes of Loss" provision contains an ensuing loss clause excluding damage "*caused* by . . . animals, vermin or insects unless physical damage not otherwise excluded by this policy results[.]" (Prop.

---

[20] The Property Insurers' interpretation is also at odds with the language of exclusions appearing elsewhere in the Property Policies that include words signifying causation. (*See, e.g.*, Aspen Prop. Policy 25–26 (excluding from coverage losses "*due to* the discharge, dispersal, seepage, migration[,] release or escape of pollutants; "*caused by* nuclear reaction or nuclear radiation"; "*caused by* . . . hostile or warlike action"; or "*occasioned* directly or indirectly from . . . enforcement of any law[.]") (emphasis added).)

Policies 24 (emphasis added).) Conversely, the ensuing loss clause in the "Types of Loss or Damage" provision excludes the types of loss listed "unless such loss or damage *results* directly *from* other physical damage not otherwise excluded[.]" (Prop. Policies 24 (emphasis added).) Read together, the ensuing loss clauses indicate that a "cause" of loss provokes a loss, whereas a "type" of loss is the loss itself. Thus, it would be unreasonable to construe these two categories of exclusions as operating in the same manner.

96.     Case law cited by the Property Insurers in support of their position is unavailing, largely because the policies in those cases explicitly exclude faulty design and latent or inherent defect as *causes* of loss rather than *types* of loss. (*See* Prop. Ins. Reply 9–10 (first citing *Alwart v. State Farm Fire & Cas. Co.,* 131 N.C. App. 538 (1998) (policy excluding coverage for property loss "caused by . . . [f]aulty, inadequate, or defective . . . design, specifications, workmanship, [or] repair"); and then citing *Vermont Elec. Power Co., Inc. v. Hartford Steam Boiler Inspection & Ins. Co.,* 72 F. Supp. 2d 441 (D. Vt. 1999) (holding policy did not "insure against loss caused by . . . [f]aulty, inadequate, or defective . . . design, specifications, workmanship, [or] repair")).[21]

---

[21] The Court declines to consider as persuasive authority *Safarian v. Fire Ins. Exchange*, No. B323862, 2023 Cal. App. Unpub. LEXIS 6731 (Cal. Ct. App. Nov. 14, 2023), an unpublished California appellate decision. *See* California Rules of Court, Rule 8.1115(a) ("[A]n opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action.").

97. In sum, the Court concludes that the language of the exclusions at issue is not ambiguous. Therefore, the language must be interpreted as written, and Nucor's position comports with basic rules of contract interpretation. Both faulty design and inherent defect are excluded *types* of loss that Nucor does not seek to recover. It has made no claim for the cost of remediating a defect in the DCS. Therefore, the Property Insurers' Motion for contrary declarations shall be **DENIED,** and Nucor's Motion with respect to these exclusions shall be **GRANTED**.

98. Moreover, given this result, the Court **ENTERS** summary judgment in favor of Nucor with respect to its breach of contract and declaratory judgment claims against the Property Insurers. N.C. R. Civ. P. 56(c) ("Summary judgment, when appropriate, may be rendered against the moving party.").

### III. Plaintiffs' Motion to Strike Levanduski Declaration

99. The Property Insurers move to strike the declaration of Gary Levanduski. Mr. Levanduski was employed as a technical manager for Nucor when the solidification incident occurred on 7 November 2017. (Levanduski Dep. 11:25–12:3, 19:11–13.) He was both deposed and offered a sworn declaration in this matter. (Levanduski Dep., ECF No. 302; Levanduski Decl., ECF No. 280.5)

100. Paragraphs three and four of Mr. Levanduski's declaration state as follows:

> 3. Part of the process of making direct reduced iron ("DRI") includes having ore pellets coated with cement powder flow into the reactor to be heated and subjected to other treatments, and then for the DRI to be discharged from the bottom of the reactor. The reactor is designed to be open to allow the flow of coated ore into the reactor and the discharge of DRI out the reactor's bottom.

4. The solidification event included the introduction of ore without cement coating into the reactor. The solidification event resulted in the following:

    a. The reactor was filled with a mass of solidified ore. Some of that ore adhered to the inside of the reactor. That ore had to be scraped off. That scraping changed the dimensions of the reactor's interior.

    b. The presence of the mass of solidified ore changed the shape of the reactor's interior, changing what should have been an open (hollow) facility into a closed one. The change in shape and closure prevented the reactor from serving its intended function.

    c. The solidification and subsequent swelling of the ore caused excessive pressure to the interior of the reactor. That swelling and excessive pressure then caused physical damage to the lining of the reactor, including but not limited to (i) damage to the mortar joints and (ii) shortening the reactor's lifespan.

    d. The repair of the above damage required repairs to the mortar joints within the reactor, scraping off adhered ore from the reactor's interior, cutting open the side of the reactor to access the solidified ore, and essentially jack hammering out the solidified mass of ore.

(Levanduski Decl. 2.)

101. The Property Insurers argue that the Levanduski Declaration should be stricken because it contradicts Mr. Levanduski's deposition testimony and contains legal conclusions. (Pls.' Mot. Strike 2; Pls.' Br. Supp. Mot. Strike 2, 5–6.) Specifically, they point to instances during Mr. Levanduski's deposition in which he testified that he did not understand why there was no cement coating on the ore, what an encoder was, or how the DCS operated. The Property Insurers also point to Levanduski's statements that he could not recall many details about the incident and was not involved in any repairs to the reactor. (Pls.' Br. Supp. Mot. Strike 3–4; Levanduski

Dep. 18:7–13, 19:7–10, 24:6–10, 30:18–21, 34:12–17.) They contend that Mr. Levanduski, by virtue of this testimony, "disavowed any knowledge of what occurred within the reactor," and argue that statements to the contrary in Mr. Levanduski's declaration are simply Nucor's attempt to create an issue of fact. (Pls.' Br. Supp. Mot. Strike 5–6.)

102. In addition, the Property Insurers argue that Mr. Levanduski's declaration includes conclusory statements regarding how (a) the DCS operates; (b) the reactor could not serve its intended function due to a change in the shape of its interior; (c) the ore swelled inside the reactor and caused "excessive pressure"; and (d) such excessive pressure resulted in physical damage to the reactor. (Pls.' Br. Supp. Mot. Strike 6.) They argue that under North Carolina law, which makes affidavits and declarations "devoid of factual basis" improper, the Levanduski Declaration must be stricken. (Pls.' Br. Supp. Mot. Strike 6.)

103. Nucor responds that Mr. Levanduski's declaration does not contradict his deposition testimony and contains facts, not legal conclusions. (Br. Opp'n Mot. Strike Levanduski Decl. 1, 6–12, ECF No. 313 [Nucor Br. Opp'n Mot. Strike].) It maintains that the Property Insurers misunderstand the scope of his testimony. According to Nucor, Mr. Levanduski's job was to oversee the removal of clustered ore from the reactor and, consequently, his testimony is limited to his personal knowledge of the impact the clustered ore had on the reactor. Nucor concedes that Mr. Levanduski's personal knowledge does not extend to matters involving the DCS or the encoders. (Nucor Br. Opp'n Mot. Strike 6–7.)

104. Nucor further contends that the Property Insurers misrepresent Mr. Levanduski's testimony. It contends that while Mr. Levanduski could not recall details like the diameter of the reactor, he recalled many other relevant details. For example, Nucor points to Mr. Levanduski's testimony that the solidification incident occurred because the ore was not coated with cement; that Nucor had to cut a hole in the side of the reactor to access the solidified ore; and that Nucor used machinery to chisel the solidified ore out of the reactor. According to Nucor, the fact that Mr. Levanduski's testimony indicates that he did not personally perform repairs to the reactor does not bear on his personal knowledge that the repairs occurred. (Nucor Br. Opp'n Mot. Strike 8–10; Levanduski Dep. 29:19–30:17, 36:12–16.)

105. Nucor further argues that Levanduski's statements in paragraphs three and four of his declaration are facts, not legal conclusions, and stem from the personal knowledge he acquired while working as a manager at two Nucor DRI facilities for more than ten years. (Nucor Br. Opp'n Mot. Strike 11–12.) In short, Nucor maintains that Mr. Levanduski's declaration is both consistent with his deposition testimony and provides additional information not sought by the Property Insurers. (Nucor Br. Opp'n Mot. Strike 9–10.)

106. While "[a] motion to strike is addressed to the sound discretion of the trial court[,]" *Clark v. Burnette*, 2021 NCBC LEXIS 45, at *16 (N.C. Super. Ct. Apr. 29, 2021); *see also Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 25 (2003), it is also true that "a party opposing a motion for summary judgment cannot create an issue of fact by filing an affidavit contradicting his prior sworn testimony."

*Supplee v. Miller-Motte Bus. Coll. Inc.*, 239 N.C. App. 208, 225 (2015).  Therefore, a court should exclude the portions of an affidavit containing "additions and changes [that constitute] conclusory statements or recharacterizations more favorable to the party who submitted the affidavit." *True Homes, LLC v. City of Greensboro*, 292 N.C. App. 361, 369 (2024).

107.  Here, however, the Levanduski Declaration contains no "direct contradictions that render [it] a sham." *Encompass Servs., PLLC v. Maser Consulting P.A.*, 2021 NCBC LEXIS 59, at *24 (N.C. Super. Ct. June 28, 2021).  Although Mr. Levanduski testified that he could not recall certain details about the solidification, his testimony does not indicate that he disavowed all knowledge of the solidification's impact on the reactor.

108.  Paragraph three of Mr. Levanduski's declaration corresponds with his deposition testimony that the reactor contained "clustered solidification material," and that the incident occurred because the ore was not properly coated with cement. (Levanduski Dep. 19:3–25.)  Paragraph four of the declaration corresponds with Mr. Levanduski's testimony that "[t]here was no discharge material coming out of the [reactor's] bottom"; Nucor had to use machinery to "break the cluster up into smaller pieces"; Nucor had to cut a hole into the side of the reactor to access the cluster; and other crewmembers undertook repairs to the reactor.  (Levanduski Dep. 21:11–13; 29:19–30:17.)  To the extent Mr. Levanduski's declaration references the damage the reactor suffered, it does not conflict with his deposition testimony because the deposition addresses damage to one part of the reactor (the mortar joints) and the

declaration references another (the process gas heater). (Levanduski Dep. 56:19–57:8.)

109. Accordingly, the Court **DENIES** the Motion to Strike.

### IV. CONCLUSION

110. For the foregoing reasons, the Court **ORDERS** as follows:

a. The EB Insurers' Motion is **GRANTED in part** and **DENIED in part**.

    i. The Court **GRANTS** the EB Insurers' Motion with respect to Nucor's breach of contract, declaratory judgment, and UDTPA claims.

    ii. The Court **ENTERS JUDGMENT** declaring that there is no coverage for Nucor's loss under the EB Policy because no Breakdown, as that term is defined in the EB Policy, occurred.

    iii. The EB Insurers' Motion for attorney's fees and costs is **DENIED** without prejudice.

b. Nucor's Motion for Partial Summary Judgment against the EB Insurers is **DENIED** as moot.

c. Nucor's Motion for Partial Summary Judgment against the Property Insurers is **GRANTED**, and the Court **ENTERS JUDGMENT** declaring that the Property Insurance Policies provide coverage for Nucor's loss.

d. The Property Insurers' Motion for Summary Judgment is **DENIED**.

e.  The Property Insurers' Motion to Strike the Levanduski Declaration is

**DENIED**.

**IT IS SO ORDERED**, this the 31st day of October, 2025.


/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases